# IN THE COURT OF APPEALS
## OF THE
## STATE OF MISSISSIPPI
### NO. 97-CA-01179 COA

**MICHAEL TURNBOUGH**                                                    **APPELLANT**

**v.**

**JANET LADNER**                                                         **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 09/04/1997 |
| TRIAL JUDGE: | HON. KOSTA N. VLAHOS |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CIRCUIT COURT |
| FOR APPELLANT: | JOE SAM OWEN |
| | ROBERT P. MYERS JR. |
| FOR APPELLEE: | ROBERT M. FREY |
| | MICHAEL E. MCWILLIAMS |
| NATURE OF THE CASE: | CIVIL - CONTRACT |
| TRIAL COURT DISPOSITION: | SUMMARY JUDGMENT IN FAVOR OF DEFENDANT. |
| DISPOSITION: | AFFIRMED - 12/18/98 |
| MOTION FOR REHEARING FILED: | 1/26/99 |
| CERTIORARI FILED: | 4/6/99 |
| MANDATE ISSUED: | |

BEFORE BRIDGES, C.J., PAYNE, AND SOUTHWICK, JJ.

SOUTHWICK, JR., FOR THE COURT:

¶1. Michael Turnbough suffered decompression sickness following a scuba dive. He filed suit against his instructor, Janet Ladner, alleging that she was negligent in planning the dive. Relying on a release that Turnbough had executed in favor of Ladner, the Harrison County Circuit Court granted Ladner's motion for summary judgment. Turnbough appeals asking that we declare the release to be against public policy. We do not.

### FACTS

¶2. In the summer of 1994, Michael Turnbough enrolled in a scuba diving class offered through the Gulfport Yacht Club and instructed by Janet Ladner. Turnbough wanted to obtain open-water certification. He had previously been a certified scuba diver but by the mid-1980's his certification had expired. At the first

meeting in 1994, Ladner informed prospective students that they must execute a release in order to participate in the class. After questioning a fellow student who was an attorney, Turnbough executed the document entitled "Liability Release and Express Assumption of Risk." The release purported to hold harmless Janet Ladner, Gulfport Yacht Club, and the certifying authority, Professional Association of Diving Instructors, from liability for any injuries arising out of participation in the course, including those resulting from the negligence of Ladner.

¶3. Following completion of the six-week course, the class traveled to Panama City, Florida, in order to perform their "check-out dives" and receive certification. On the morning of Sunday, July 24, 1994, the class met and boarded the dive boat. Ladner had scheduled two dives of sixty feet each; however, due to overcrowding by fishing boats and other dive groups, the first dive site was only forty-six to forty-eight feet deep. Based on a projected depth of sixty feet, Ladner calculated the maximum time allowable for the second dive as thirty-eight minutes.

¶4. That evening, on his way back to Gulfport, Turnbough began to feel the first effects of decompression sickness, commonly known as "the bends." At work on Monday, he suffered pain in his joints, a pain that he described as arthritic. He contacted Ladner on Tuesday and informed her of his symptoms. Upon her advice, he telephoned a diver's hotline and, after describing his symptoms, was instructed to visit a dive hospital. Turnbough received treatment for decompression sickness at the Joe Ellen Smith Hospital in New Orleans.

¶5. The instructor Ladner had descended before and ascended after every student during the dives in question. Neither she nor any other diver besides Turnbough reported suffering decompression symptoms. Turnbough stated in his deposition that he had perhaps three drinks the night before the dive, despite being instructed not to have alcohol "immediately before or after a dive." At one stage he had informed a friend that the alcohol might have had an impact on his decompression sickness. At the time of summary judgment there was no evidence proving a correlation between alcohol consumption several hours before a dive and Turnbough's illness.

¶6. Turnbough filed suit on February 10, 1995, alleging that Ladner was negligent in her supervision of him during the dive and in exposing him to decompression injury. Ladner filed a motion for summary judgment on October 27, 1995, asserting that Turnbough had previously released her from liability and expressly assumed the risk of such an injury. The circuit judge agreed and granted her motion.

## DISCUSSION

¶7. This Court conducts a *de novo* review of the record on appeal from a grant of a motion for summary judgment. *Miss. Transp. Comm'n v. SCI, Inc.*, 717 So.2d 332, 335 (Miss. 1998). Any evidence that would support the non-movant's right to continue past the motion must be considered, including that shown in admissions, answers to interrogatories, depositions, and the like, such that any fact issue will require the denial of the motion. *Id.* at 335-36.

¶8. In this case Turnbough signed a half-page document entitled "Liability Release and Express Assumption of Risk." There were seven paragraphs, each with a blank for the diver's initials to indicate that the paragraph had been read. It in part stated:

I, Michael Turnbough, hereby affirm that I have been advised and thoroughly informed of the inherent

dangers of skin diving and scuba diving.

Further, I understand that diving with compressed air involves certain inherent risks: decompression sickness [and others]. . . .

I understand and agree that neither my instructor(s) Janet Ladner [nor the Yacht Cub or other participants] may be held liable or responsible in any way for any injury, death, or other damages to me or my family, heirs, or assigns that may occur as a result of my participation in this diving class or as a result of the negligence of any party, including the Released Parties, whether passive or active.

¶9. Turnbough did not immediately sign the release but discussed it with a friend who was taking the class. The friend was an attorney and told Turnbough not to worry with it, that such releases were unenforceable. Of course, that is our issue. What is not our issue is the effect of such a clause if it attempts to exonerate from intentional injuries. We are only addressing negligence.

¶10. The starting point for evaluating such releases of liability is that generally they are enforceable. "The power to invalidate contracts or agreements on the ground that they violate public policy is far reaching and easily abused . . . ." *Cappaert v. Junker*, 413 So.2d 378, 380 (Miss. 1982). Before a public policy will be found compelling, "the public policy of the state must be found in its constitution and statutes, 'and when they have not directly spoken, then in the decision of the courts and the constant practice of the government officials.'" *Id.* (quoting *State ex rel Knox v. Hines Lumber. Co.*, 150 Miss. 1, 115 So. 598 (1928)).

¶11. One public policy that results in enforcement of such waivers is the need to uphold the rights of contracting parties. Waivers are commonly acquired in high-risk situations in which the dangers are known and the chance of injury sufficiently realistic as to justify a pre-activity establishment of rights. They at times permit a negligent party from avoiding liability, but they perhaps with equal frequency protect non-negligent parties from having to prove their meeting of the proper standard of care. Such proof involves difficult fact questions and expensive legal proceedings. In situations not affected by public policy considerations, the agreements are valid.

¶12. Only in limited circumstances has the supreme court invalidated an exculpatory contract as against public policy. The court has considered whether it was permissible for a landlord to seek to immunize himself against any damages resulting from his negligence in maintaining a common area on leased premises. *Cappaert*, 413 So.2d at 379. In answering the question in the negative, the court relied on the principle established by prior cases that "[i]n leases involving residential property leased to multiple tenants, the lessor, with respect to common areas, has the duty to use reasonable care to keep the common areas reasonably safe and is liable for damages for failure to perform the duty." *Id.* at 380. Moreover, because of the potential impact upon thousands of people who choose to rent rather than purchase, "it cannot be said that such exculpatory clauses are 'purely a private affair' or that they are 'not a matter of public interest.'" *Id.* at 381 (quoting *McCutcheon v. United Homes Corp.*, 486 P.2d 1093, 1096 (Wash. 1971)).

¶13. The court has similarly invalidated such clauses where an employer sought to enforce an employment contract that "release[d] the company from every conceivable act of negligence of any employee of the company no matter how gross." *Illinois Cent. R.R. Co. v. Harris*, 108 Miss. 574, 67 So. 54, 56 (1914).

The release prohibited the employee from recovering from the railroad for injuries that occurred because of the risks attendant to railroad work. The court held that if such a contract were enforced "'the final outcome would be to fill the country with disabled men and paupers, whose support would become a charge upon the counties or upon public charity.'" *Id.*, (quoting *Little Rock R.R. Co. v. Eubanks*, 3 S.W. 808, 810 (Ark. 1887)).

¶14. Another context in which such a contract has been declared void involved public service companies. The supreme court recently held that "[i]n contracts between the utility and its customers, where the utility's public duty to exercise a very high degree of care is invoked, we hold that indemnity provisions protecting the utility from its own negligence are void as a matter of public policy." *Entergy Miss., Inc. v. Burdette Gin Co.*, 97-CA-00481-SCT ( ¶ 10 ) (Miss. 1998). *See also Western Union Telegraph Co. v. Bassett*, 111 Miss. 468, 71 So. 750, 751 (1916)(court refused to allow a telegraph company to limit its liability for negligently transmitted messages).

¶15. Turnbough would have us make a similar ruling with regard to water sports. That is, safety in water sports is such a matter of public concern in Mississippi that any attempt to limit liability by contract is void as against public policy. The cases relied upon by Turnbough do not involve exculpatory contracts, but stand for the proposition that "the owner or operator of a bathing resort or swimming pool is bound to use ordinary, due, or reasonable care for the safety of patrons, or to guard against injury to them; and that he must use due or reasonable care, or must exercise vigilance, to provide a safe place, or safe accommodations, or to maintain the premises in a safe condition." *Mock v. Natchez Garden Club*, 230 Miss. 377, 386, 92 So.2d 562, 565 (1957).

¶16. The fact that the owner of a swimming pool open to a large segment of the public owes a duty to patrons does not equate to a finding that exculpatory contracts regarding scuba diving are invalid. Of the state courts that have considered this precise issue, virtually all have upheld the agreements as not implicating public policy. *Mann v. Wetter*, 785 P.2d 1064, 1066 (Ore. Ct. App. 1989) (diving school does not provide an essential public service); *Marshall v. Blue Springs Corp*., 641 N.E.2d 92, 95 (Ind. Ct. App.1994) (public policy does not void agreements that exculpate one from the consequences of his own negligence); *Madison v. Superior Court*, 203 Cal.App.3d 589, 598-599, 250 Cal.Rptr. 299, 304 (Cal. Ct. App. 1988)(public policy does not oppose private, voluntary transactions in which one party, for a consideration, agrees to shoulder a risk which the law would otherwise have placed upon the other party); *Baschuk v. Diver's Way Scuba*, 618 N.Y.S.2d 428, 429 (N.Y. App. Div. 1994) (fact that the injured plaintiff claimed not to have read or understood the release does not void the agreement); *Boyce v. West*, 862 P.2d 592, 597 (Wash. Ct. App. 1993) (scuba diving involves no more a question of public interest than does motor cross racing, sky diving, or motorcycle dirtbike riding); *Hewitt v. Miller*, 521 P.2d 244, 247 (scuba diving instruction does not involve a public duty such as that of a common carrier or a public utility) (Wash. Ct. App.1974); *Newman v. Tropical Visions, Inc.*, 891 S.W.2d 713, (Ct.App.Tex. 1994) (public policy does not, in the ordinary case, prevent parties from contracting as they see fit).

¶17. The rationale behind these decisions is that a voluntary recreational activity by an individual does not implicate such a public concern as to invalidate the clause. As one court noted, to "invalidate all exculpatory releases connected with a recreational activity . . . would dramatically raise the cost of participation in these activities and severely limit the public's recreational opportunities." *Clanton v. United Skates of America*, 686 N.E.2d 896, 900 (Ct. App. Ind. 1997). There has never been a ruling in this State nor any other pointed out to us that exculpatory clauses are invalid if they are executed as to high-risk recreational

activities involving an instructor and a student. In such situations there will almost always be an experienced individual and a novice. The novice, by agreeing to such a clause, recognizes the dangers inherent in acquiring the desired skill. Parties have the right to contract on the basis of the seriousness of the desire.

¶18. Mississippi courts will uphold an exculpatory contract where it is unaffected by any public interest. *Smith v. Smith*, 375 So.2d 1041, 1043 (Miss. 1979). The contract between Turnbough and Ladner is of the type contemplated as "purely a 'personal and private affair' and 'not a matter of public interest.'" *Cappaert v. Junker*, 413 So.2d at 381.

¶19. Judge Tom Lee summarized this area of the law in *The Kroger Co. v. Chimneyville Properties, Ltd.*, 784 F.Supp. 331, 348 (S.D. Miss. 1991). The court noted that (1) "where the parties . . . occupy equal bargaining positions," (2) "where the clause implicates only private, and not public interests," and (3) "where the exculpatory clause will not immunize a party from liability for damages caused by his violation of a duty imposed by the common law," the clause will be enforced. *Id.* at 348-49.

¶20. Applying the test to the case at hand, we hold the release to be valid. There has been no showing of unequal bargaining power between the two parties. Indeed, Turnbough stated that he questioned a fellow classmate and attorney about the release and chose to sign it. A private recreational activity is not the equivalent of a take-it-or-leave-it employment contract offered in *Illinois Central v. Harris*, or apartment leases in *Cappaert*. We have already discussed the second and third factors in applying Mississippi law to the present case and determined that neither operates to invalidate the release. No public interest is implicated by the release nor does it immunize Ladner from liability for damages caused by breach of a duty imposed upon her by law.

¶21. **THE JUDGMENT OF THE HARRISON COUNTY CIRCUIT COURT IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE TAXED TO THE APPELLANT.**

**BRIDGES, C.J., AND McMILLIN, P.J., COLEMAN, DIAZ, HERRING, HINKEBEIN, KING, AND PAYNE, JJ., CONCUR.**

**THOMAS, P.J., NOT PARTICIPATING.**